IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

ROBERICK WASHINGTON,

        Plaintiff,

v.                                                              Case No. 14-2108-JTM

UNIFIED GOVERNMENT OF
WYANDOTTE COUNTY, KANSAS, et al.,

        Defendant.

**MEMORANDUM AND ORDER**

This action arises out of plaintiff Roberick Washington's termination as an employee of the Wyandotte County Juvenile Detention Center ("JDC") in Kansas City, Kansas. Plaintiff was fired after testing positive for cocaine in a random urine drug test. He brought this suit against defendants Unified Government of Wyandotte County/Kansas City, Kansas ("the UG"); Wyandotte County Sheriff Donald Ash; Terri Broadus, administrator of the JDC; Gary Ortiz, UG Assistant County Administrator; and Douglas G. Bach, UG Deputy County Administrator. Plaintiff brings claims under 42 U.S.C. § 1983 for an unlawful search, due process violations, entitlement to a name-clearing hearing, and breach of an implied employment contract. Defendants Ash, Broadus, Ortiz, and Bach assert a qualified immunity defense. Before the court is defendants' Motion for Summary Judgment (Dkt. 35) on all claims. As discussed below, the motion is granted.

## I. Uncontroverted Facts

The UG Sheriff's Department employed plaintiff as a lieutenant at the JDC, which houses up to 48 juveniles, both male and female, from ages 10 to 17. The JDC residents are juvenile offenders facing criminal charges. Many have a history of substance abuse and some are gang members. It is a secure facility; entrances and exits are controlled by staff at all times. The JDC also serves as a school and child development center for residents. Residents are supervised by juvenile detention officers, who are in turn supervised by sergeants and lieutenants. Officers are responsible for ensuring residents' safety, security, and care. They have significant contact with residents daily, and their duties range from intervening in resident fights to escorting residents to class.

Plaintiff served as the JDC training coordinator. He trained new officers on safety-related activities, including: accident and injury prevention; child abuse, neglect and exploitation reporting; crisis management and intervention; emergency and safety procedures; facility policies and procedures; first aid, including rescue breathing; health, sanitation, and safety measures; job duties and responsibilities; juvenile rights; observation of symptoms of illness and communicable diseases; policies regarding behavior management, use of restraints, and crisis intervention; and suicide prevention. Plaintiff also provided or coordinated 40 hours of annual in-service training for experienced officers on similar subjects. He directly advised officers regarding interactions with residents. Plaintiff supervised officers on the detention center floor on some nights and weekends. He also had personal contact with residents upon their

admission to the JDC during the "classification" process. He further served as a hearing officer on disciplinary tickets issued to residents.

**A. The UG Substance Abuse Policy**

UG maintains a substance abuse policy ("SAP") that includes random drug testing of employees in "safety sensitive" positions. (Dkt. 35-2, at 9). The SAP lists certain job functions that qualify a position as "safety sensitive" if performed regularly, including "[m]onitoring or supervising offenders or detainees in the criminal justice system, both juveniles and adults . . . ." (Dkt. 35-2, at 15). The SAP specifies that the Sheriff's Department positions of "juvenile detention officer" and "juvenile lieutenant" at the JDC are "safety sensitive" positions. (Dkt. 35-2, at 40).

Random drug testing is conducted by collecting and testing urine samples that are divided into two bottles: Bottle A and Bottle B. Testing is performed on Bottle A. By reference to 49 C.F.R. 40, the SAP defines a positive cocaine test as the presence of cocaine metabolites at concentrations of 150 ng/mL on initial test and 100 ng/mL upon a confirmatory test. Positive test results are confirmed by a medical review officer ("MRO"). After a positive drug test, an employee may make a request to the MRO that Bottle B be tested by a separate laboratory.

The SAP specifies that "[a]n employee who is tested under the provisions of this policy and who has a positive test result for drugs . . . is subject to discipline including discharge." (Dkt. 35-2, at 30). Under the SAP, "[a]ction to discipline an employee must be taken in accordance with the Human Resources Guide or applicable bargaining agreement." *Id.*

The Human Resources Guide ("HRG") suggests suspension upon a first offense for "[p]ossession, use or being under the influence of an intoxicant or drug while on duty." (Dkt. 35-2, at 45-47). The HRG also specifies that "[a] more severe penalty than indicated may be imposed if warranted by the circumstances." (Dkt. 35-2, at 45). Under the HRG, penalties are left "to be determined by the circumstances" for violations of department rules or regulations and violation of safety rules. (Dkt. 35-2, at 46).

## B. Plaintiff's Positive Drug Test, Termination, and Grievance

On March 7, 2012, plaintiff supplied a urine sample pursuant to the SAP's random drug testing program. In accord with the SAP, the sample was divided into Bottles A and B. Bottle A was submitted to Quest Diagnostics for testing. On March 15, 2012, Quest reported to the MRO, Gregory Bono, M.D., that plaintiff had tested positive for cocaine. The same day, Dr. Bono notified Renee Ramirez, the administrator of the UG's drug and alcohol testing program, of the positive test result. Ramirez notified Sheriff Ash. Sheriff Ash, Ramirez, and Broadus met with plaintiff that afternoon and informed him of the positive test. Plaintiff asked to have Bottle B tested by a different laboratory, Clinical Reference Laboratory. They obliged, and Bottle B also tested positive for cocaine metabolites. On or about March 20, 2012, Sheriff Ash terminated plaintiff's employment for violating the SAP.

On March 22, 2012, plaintiff filed a grievance regarding his termination under the UG's grievance procedure. Broadus and Sheriff Ash denied the grievance, and plaintiff appealed that denial to the County Administrator. On April 24, 2012, Ortiz presided over the appeal hearing, at which plaintiff was represented by counsel. On May 8, 2012,

plaintiff's counsel emailed documentation to Ortiz purporting to be results of a hair sample drug test performed by Omega Laboratories on April 24, 2012. The Omega test reported negative for cocaine metabolites above a cut-off level of 500pg/mg. In a memorandum to defendant Bach dated May 14, 2012, Ortiz reported his findings of fact and recommended that plaintiff's termination be upheld. In a letter dated May 15, 2012, Bach informed plaintiff that his grievance was denied.

## II. Summary Judgment Legal Standard

Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). A factual dispute is material if it "might affect the outcome of the suit . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

"The movant bears the initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact and entitlement to judgment as a matter of law." *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)). If the moving party carries its burden of demonstrating the absence of a genuine issue of material fact, the burden shifts to the non-moving party to show "that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." *Applied Genetics Int'l, Inc. v. First Affiliated Secs., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990) (citing *Celotex*, 477 U.S. at 324).

5

The non-moving party may not rely upon mere allegations or denials in its pleadings or briefs, but must present specific facts showing the presence of a genuine issue of material fact for trial. *Liberty Lobby*, 477 U.S. at 256. Summary judgment may be granted if the nonmoving party's evidence is merely colorable or is not significantly probative. *Id.* at 249–50. The non-moving party must do more than simply show there is some metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The court must determine "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby*, 477 U.S. at 251-52. "In making such a determination, the court should not weigh the evidence or credibility of witnesses." *Wells v. Wal-Mart Stores, Inc.*, 219 F. Supp. 2d 1197, 1200 (D. Kan. 2002). The court must view the evidence and all reasonable inferences in the light most favorable to the nonmoving party. *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

### III. Analysis

**A. Sheriff Ash and the UG are granted summary judgment on plaintiff's Fourth Amendment claim.**

Plaintiff claims that defendants Ash and the UG subjected him to an unlawful search by demanding that he submit urine samples for drug testing.

<u>1. Sheriff Ash is entitled to qualified immunity on plaintiff's Fourth Amendment claim.</u>

Sheriff Ash asserts a qualified immunity defense to the Fourth Amendment claim, which requires the court to use an atypical summary judgment analysis. "When a

6

defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established." *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009). The court must evaluate whether a constitutional right was violated by considering the facts alleged "in the light most favorable to the party asserting the injury." *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1312 (10th Cir. 2002) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). The court has discretion to address the two prongs in any order. *Becker v. Bateman*, 709 F.3d 1019, 1022 (10th Cir. 2013). "If, and only if, the plaintiff meets this two-part test does a defendant then bear the traditional burden of the movant for summary judgment—showing that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law." *Clark v. Edmunds*, 513 F.3d 1219, 1222 (10th Cir. 2008) (internal citation omitted).

> *a. Sheriff Ash did not violate a constitutional right by demanding urine drug tests.*

The Fourth Amendment protects individuals from unreasonable government searches. U.S. CONST. amend IV. State-compelled collection of urine samples for drug testing is a search under the Fourth Amendment. *Skinner v. Railway Labor Exec.'s Ass'n*, 489 U.S. 602, 618 (1989). A search is generally considered reasonable "only if it is supported by a warrant issued on probable cause." *Saavedra v. City of Albuquerque*, 73 F.3d 1525, 1531 (10th Cir. 1996). The Supreme Court has recognized an exception to this rule "when special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable." *Skinner*, 489 U.S. at 619 (internal quotation and citation omitted). A "special needs" search is constitutional

7

under the Fourth Amendment's reasonableness requirement if the governmental interest outweighs the individual privacy interest in the particular context in which the search took place *Id.*; *Nat'l Treasury Emps. Union v. Von Raab*, 489 U.S. 656, 665-66 (1989).

When determining whether a "special needs" exception applies, the court must first evaluate whether plaintiff had a reasonable expectation of privacy, then balance that expectation against the governmental interest to determine whether the intrusion was reasonable. *See City of Ontario, Cal. v. Quon*, 560 U.S. 746, 756-68 (2010).

An individual has a protected privacy interest in the collection and testing of his urine. *See Skinner*, 489 U.S. at 617. However, "it is plain that certain forms of public employment may diminish privacy expectations even with respect to such personal searches." *Von Raab*, 489 U.S. at 671 (noting that employees of the "[U.S.] Mint, for example, should expect to be subject to certain routine personal searches when they leave the workplace every day"). Certain "operational realities of the workplace" may also diminish the employee's privacy expectation. *Id.* at 671-72 (Customs employees directly involved in drug interdiction or who carry firearms have a diminished expectation of privacy regarding a urine drug test). Official policies can also diminish the employee's expectation of privacy. *See Quon*, 560 U.S. at 758 (evaluating the City's Computer Policy clearly stating no expectation of privacy when using City computers in expectation of privacy analysis).

Here, plaintiff is employed as a supervisory lieutenant in a juvenile correction facility. The facility houses individuals who are charged with crimes, may be involved in drug activities, and may engage in violence within the facility at any time. Plaintiff's

8

duties, even if administrative, may involve direct contact with or interdiction of illegal drugs or improvised weapons within the facility. Plaintiff performs a supervisory, and sometimes direct, role in the safety and educational development of residents. His success in the role of supervisor, trainer, and advisor depends uniquely on his judgment and ability to reason clearly. Information gathered from a urine drug test bears directly on his fitness to perform those functions. Further, the UG's SAP specifies that lieutenants employed by the Sheriff's Department at the JDC are subject to random urine drug testing. The circumstances of plaintiff's job diminish his expectation of privacy regarding urine drug testing.

His diminished expectation of privacy must be balanced against the government's interest in ensuring that he does not use illegal drugs.

The operation of "a government office, school, or prison . . . presents special needs beyond normal law enforcement that may justify departures from the usual warrant and probable-cause requirements." *Skinner*, 489 U.S. at 620. The detention center is both a school and a jail, and thus presents such "special needs." It houses troubled youths ranging in age from 10 to 17. Many may be susceptible to illegal drug use. They are young and impressionable and may be able to alter their future path in a positive manner if kept isolated from the perils of illegal drugs. Drug testing individuals who operate the JDC is important to ensure that they can provide residents a safe environment and serve as unimpaired role models. Further, drug testing helps prevent any drug use or trafficking within the JDC that may be facilitated by a JDC

lieutenant working in an administrative, supervisory, or direct-contact role within the facility.

The state has "undertaken a special responsibility of care and direction" for these youths. *Bd. of Educ. of Ind. Sch. Dist. No. 92 of Pottawatomie Cnty. v. Earls*, 536 U.S. 822, 834 (2002) (quoting *Veronia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 662 (1995)). The governmental interest in ensuring that plaintiff and others in his position abstain from illegal drug activity is great and outweighs plaintiff's diminished privacy interest in the collection and testing of his urine. The search was reasonable; Sheriff Ash did not violate a constitutional right by demanding random urine samples for drug testing.[1]

Plaintiff thus fails to overcome the qualified immunity defense by proving a violation of a constitutional right that was well-established. Sheriff Ash is therefore entitled to qualified immunity on plaintiff's Fourth Amendment claim.

2. The UG did not violate the Fourth Amendment.

"[None] of our cases authorize[] the award of damages against a municipal corporation based on the actions of one of its officers when in fact . . . the officer inflicted no constitutional harm." *Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1322 (10th Cir. 2009) (quoting *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)). Where plaintiff's claims fail against the officer, they also fail against the municipality. *Id.*

---

[1] Suspicionless urine drug screening has been found reasonable under the special needs exception for: railroad employees engaged in train operations to protect public safety, *Skinner*, 489 U.S. 602; student athletes to prevent drug use in public schools, *Veronia*, 515 U.S. 646; and federal customs agents who carry arms or are involved in drug interdiction, *see Von Raab*, 489 U.S. 656.

Therefore, no genuine issue remains for trial: summary judgment is proper in favor of the UG because Sheriff Ash did not violate the Fourth Amendment.

**B. Defendants are entitled to summary judgment on plaintiff's due process claims.**

Plaintiff alleges that all defendants violated his substantive and procedural due process rights. The individual defendants assert a qualified immunity defense.

<u>1. Defendants Ash, Broadus, Ortiz, and Bach did not violate plaintiff's due process rights.</u>

"The Due Process Clause of the Fourteenth Amendment ensures that one cannot be deprived of a property right absent due process of law." *Potts v. Davis Cnty.*, 551 F.3d 1188, 1192 (10th Cir. 2009). A protected property right is prerequisite to either a substantive or procedural due process claim concerning employment. *Id.* "In the employment context, a property interest is a legitimate expectation in continued employment." *Hesse v. Town of Jackson, Wyo.*, 541 F.3d 1240, 1245 (10th Cir. 2008). The court looks to state law to determine whether such an interest exists for an employee of that state. *See id.*

Under Kansas law, a property interest in public employment exists only where tenure for the office is established by the constitution, statute, ordinance, contract, or implied contract. *Stoldt v. City of Toronto*, 678 P.2d 153, 160 (Kan. 1984). A Kansas sheriff may "appoint, promote, demote, and *dismiss* additional deputies and assistants necessary to carry out the duties of the office . . . ." K.S.A. § 19-805(a) (emphasis added); *see also Owens v. Rush*, 654 F.2d 1370, 1376 (10th Cir. 1981) (county sheriff "has plenary power of appointment and removal"). Kansas sheriff's department employees thus

11

have no tenure expectation derived from the state constitution, statute, or ordinance. Plaintiff does not allege a contractual guarantee to tenure, but does allege such guarantee by implied contract.

*a. Plaintiff does not have a protected property interest created by implied contract.*

Under Kansas law, "an employee hired for an indefinite term is an 'at-will employee' without a property interest." *USD No. 457 v. Phifer*, 729 F. Supp. 1298, 1303 (D. Kan. 1990) (quoting *Conaway v. Smith*, 853 F.2d 789, 793 (10th Cir. 1988)). However, an implied contract for a definite period of time might establish a protected property interest. *Farthing v. City of Shawnee, Kan.*, 39 F.3d 1131, 1138 (10th Cir. 1994). Personnel policy manuals alone are insufficient to create an implied employment contract under Kansas law. *Id.*; *Conaway*, 853 F.2d at 794. Although the existence of an implied contract under Kansas law is "normally a factual issue heavily dependent on the intent of the parties," the district court may rule on the issue in summary judgment if the facts presented are insufficient to survive the motion. *Farthing*, 39 F.3d at 1138.

Plaintiff argues that the combination of K.S.A. § 19-805(d), the UG Grievance Procedure and HRG, and his employer's course of conduct together create an implied employment contract that employment will continue until terminated under the HRG. According to plaintiff, the HRG indicates an expectation of continued employment, rather than dismissal, for a first positive drug test. However, the HRG does not provide a *definite term of employment* for plaintiff or anyone in his situation. The sections of the HRG referenced by plaintiff indicate when an employee can be terminated for positive drug tests. The event of an employee testing positive for drugs is anything but definite –

it may never happen. Thus, the HRG does not indicate a definite term of employment. Rather, within a "protected property interest" analysis, plaintiff's argument is self-defeating because it proposes an implied contract to continue at-will employment, which has no protected property interest under Kansas law. Thus, even if an implied employment contract existed, it would not support plaintiff's due process claim.

Plaintiff fails to identify any statute, policy, course of conduct, or other evidence indicating an implied contract establishing a definite term of tenure. He fails to establish that he has a protected property interest in his employment with the UG, and thus fails to show that the individual defendants violated a due process right. Defendants Ash, Bach, Broadus, and Ortiz are entitled to qualified immunity on plaintiff's due process claims.

In the absence of a constitutional violation by the individual defendants, plaintiff cannot prevail against the UG on his due process claim. No genuine issue of material fact remains for trial. Accordingly, summary judgment is granted in favor of all defendants on plaintiff's due process claims.

**C. Plaintiff is not entitled to a name-clearing hearing.**

The implication of a liberty interest is prerequisite to entitlement to a name-clearing hearing based on a due process violation. *See Workman v. Jordan*, 32 F.3d 475, 480 (10th Cir. 1994); *McDonald v. Wise*, 769 F.3d 1202, 1212 (10th Cir. 2014). Here, the pretrial order does not include a claim that a liberty interest was damaged. The pretrial order supersedes all pleadings and controls the litigation. FED. R. CIV. P. 16(d), (e); D. KAN. R. 16.2(c). Plaintiff is thus not entitled to a name-clearing hearing.

**D. The UG did not breach an implied employment contract.**

Plaintiff claims that the UG breached an implied contract by terminating him for a first positive drug test, rather than suspending him. As in his due process argument, plaintiff argues that the combination of K.S.A. § 19-805(d), the UG Grievance Procedure and HRG, and his employer's course of conduct together create an implied employment contract that plaintiff will not be terminated for a first positive drug test. The court disagrees.

Section 19-805(d) requires that personnel actions taken by the sheriff under § 19-805 shall be subject to the county's personnel policies and procedures – here, the HRG and SAP. Plaintiff relies heavily on the HRG's suggestion of suspension for a first offense of a drug violation. However, the HRG specifies that a more severe penalty may apply depending on the circumstances and that violations of safety rules are "to be determined by the circumstances." The SAP drug testing program is a safety rule because it specifically applies only to "safety sensitive" positions. The HRG thus indicates that penalties for violating the SAP are to be determined by the circumstances; it does not indicate a guarantee of suspension rather than dismissal for a first offense.

Further, the SAP specifies that those who supervise offenders or who are lieutenants at the JDC are subject to the SAP. Plaintiff is a lieutenant who serves in a supervisory capacity at the facility and is thus subject to the SAP; no reasonable jury would conclude otherwise. The SAP specifies that a positive drug test may result in dismissal. The SAP therefore does not indicate a guarantee of suspension rather than dismissal for a first offense.

Finally, the UG's course of conduct does not guarantee suspension for a first positive drug test. Seven out of nineteen total positive drug tests between 2009 and 2014 resulted in either dismissal or resignation in lieu of dismissal. (Dkt. 42-3). Plaintiff is employed by Sheriff Ash. K.S.A. § 19-805. Plaintiff's Exhibit A in support of his brief shows that all four Sheriff's Department employees who tested positive for drugs during that time were either dismissed or given the option to resign. (Dkt. 42-3). The undisputed facts indicate that Sheriff Ash exercises a "zero tolerance" policy within the department. Therefore, the relevant course of conduct indicates that Sheriff's Department employees will be dismissed, not suspended, after a first positive drug test.

Section 19-805(d), the UG's policies, and Sheriff Ash's course of conduct neither individually, nor in the aggregate, evince an intent to guarantee suspension, rather than dismissal, of JDC lieutenants for a first positive drug test. Instead, the undisputed facts demonstrate that the Sheriff can impose greater penalties, including dismissal, at his discretion regarding positive drug tests for JDC lieutenants. No reasonable jury would find that an implied employment contract required the UG to suspend plaintiff for his first positive drug test. Accordingly, the UG is entitled to summary judgment on plaintiff's breach of contract claim.

IT IS ACCORDINGLY ORDERED this 23rd day of July 2015, that defendants' Motion for Summary Judgment (Dkt. 34) is GRANTED.

s\ J. Thomas Marten
J. THOMAS MARTEN, JUDGE